**Opinion issued November 13, 2018.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00514-CV

————————————

## IN THE INTEREST OF C. J. W., A CHILD,

———————————————————————————————————

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2016-06746J

———————————————————————————————————

## MEMORANDUM OPINION

O.P.A. a/k/a O.A. (Father) is appealing the trial court's order terminating his parental rights to his son, C.J.W. (Charlie). On appeal, Father argues that there is legally and factually insufficient evidence supporting the trial court's findings that (1) he committed the predicate acts under Family Code sections 161.001(b)(1)(E),

(N), and (Q); and (2) termination of his parental rights is in Charlie's best interest. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(E), (N), & (Q), 161.001(b)(2) (West Supp. 2018). We affirm the trial court's order.

## Background

In 2009, Father pleaded guilty to aggravated robbery with a firearm and was sentenced to seven years' incarceration. Father was eighteen years old when the robbery was committed in 2007. He was released from prison in May 2014. Four months later, Father and C.A.W. (Mother) were arrested for committing another armed robbery with a deadly weapon. Father pleaded guilty and was sentenced to eight years' incarceration for aggravated robbery.

Charlie came into the care of the Texas Department of Family and Protective Services (the Department) because Mother was incarcerated in the Harris County jail on her armed robbery charge when she gave birth to him in April 2016. Mother pleaded guilty to committing the armed robbery with Father.

Mother initially placed Charlie with her mother, Rosemary Winters, but the Department removed him from Rosemary's care because she had a history of drug abuse. The Department then placed Charlie with Rosemary's boyfriend, Blouis Gipson, but they removed Charlie from Blouis's care after they learned that Blouis had an extensive criminal history, including a recent arrest for assaulting Rosemary.

At that point, the Department filed an original petition in which it asked the court to name the Department as Charlie's temporary managing conservator and requested that Charlie's parents' rights be terminated if reunification was not possible. The Department also asserted that Father was Charlie's alleged father and requested a determination of parentage. The same week that the Department filed suit for Charlie, Father was personally served with the Department's petition. Father's appointed attorney filed a formal answer on Father's behalf approximately three weeks later. The answer referred to Father as an alleged father, asserted a general denial, and did not request establishment of paternity.

The court held an adversary hearing on the same day as Father's answer was filed and signed a written order that required Father to comply with the Department's service plan and to provide the court and the Department with certain information, including the names and addresses of any relatives with whom Charlie could be placed during the pendency of the suit within 30 days. The court also ordered Father to submit a DNA sample to establish Charlie's parentage. Based on the test results, the court signed an order in June 2017 that formally adjudicated Father as Charlie's father.

A.    Caseworkers

Charlie's three caseworkers testified at trial. Charlie's first caseworker, Dana-Lori Charles, testified that Mother and Father had been incarcerated since the

3

Department became involved in this case. She also testified that she mailed Father a copy of his family service plan, along with a letter of introduction and her business card in February 2017, but the envelope was returned because Father was no longer at that address. Ms. Charles mailed another copy to Father at the Harris County jail. On July 10, 2017, a return receipt was signed indicating a mailing was delivered to Father by the Department at the jail's address. Three days after the delivery of the service plan, a Harris County district court signed a judgment reflecting that Father had appeared in person and pleaded guilty to his aggravated robbery charge.

Ms. Charles testified that, although Father could not complete all the family service plan's requirements while he was incarcerated, some of the classes that Father was required to attend were offered by the prison. She also acknowledged that there were some requirements that he could not complete while he was incarcerated. She also testified that although she had provided Father with her address and phone number, Father never contacted her or provided gifts, cards, or letters for Charlie while she was his caseworker. She also testified that she had been in contact with one of Father's relatives, but that person did not provide any gifts or support for Charlie. Although the relative had expressed an interest in having Charlie placed with her, Ms. Charles was unable to conduct a home study at that time because the Department was already doing a home study on someone else.

Charlie's second caseworker, Oliver Guerrero, testified that Charlie was doing very well and bonding with his current foster family and that they wanted to adopt him. Mr. Guerrero testified that he believed that the foster family could provide for Charlie's current and future emotional, financial, and physical needs and that if Mother's and Father's parental rights were terminated, there would be no issue moving forward with consummating that adoption. According to Mr. Guerrero, it was in Charlie's best interest to remain with his foster family. Mr. Guerrero also opined that Father's parental rights should be terminated because of his significant criminal history involving two armed robberies using a gun, which the caseworker considered to be endangering conduct.

Mr. Guerrero also testified that the Department had been looking for family on both sides throughout the case. He received a copy of Father's caregiver resource form from Father's attorney in October 2017. Father identified Sheree Sowell and his sister Joeniquea Johnson as possible caregivers and listed his mother, Crystal Johnson, as someone who could assist with Charlie's care. The Department conducted a home study for Joeniquea Johnson but they did not consider her to be a suitable placement for Charlie because she had several criminal convictions, including a 2017 conviction for theft. Mr. Guerrero testified that the Department had rejected Crystal Johnson as a possible placement because of her history of drug abuse, but later admitted that he might have confused Crystal with Charlie's

5

maternal grandmother, Rosemary. Mr. Guerrero did not know if the Department had considered Sheree Sowell or two other women identified by Father's counsel as possible placements for Charlie. He also testified that the Department had concerns about another fictive kin placement based on a possibly forged prescription for anxiety medication.

Mr. Guerrero confirmed he had never spoken with Father, but he did reach out to the prison unit where Father was housed and inquired as to whether Father was working on the service plan. He also testified that he saw Father at one hearing, but he never spoke with Father, and no one provided any gifts or support for Charlie while he was the child's caseworker.

Charlie's third caseworker, Amanda Ashby, described his current placement as a "very loving home" and testified that Charlie was "already calling the foster-to-adopt caregivers his mom and dad." She testified that the home was safe and stable, and that the couple appear to have a stable marriage and good parenting skills.

Ms. Ashby also testified that while Father's counsel had requested home studies for four of Father's relatives, the Department can only do one home study at a time and a home study was already pending. She acknowledged that one of Father's relatives contacted her a month before the hearing and inquired about Charlie's placement. To her knowledge, that relative had not appeared at any of the different

6

hearings in this case and had not previously shown any interest in Charlie. Ms. Ashby also confirmed that she never spoke with Father.

## B.    Mother

Mother, who voluntarily relinquished her parental rights to Charlie, also testified at the hearing. Mother testified that Father did not use drugs and that she had never seen Father engage in any criminal conduct, except for the aggravated robbery they committed together. When asked about that incident, Mother claimed that Father demanded money from someone and threatened them with a gun, and she acknowledged that she had participated in the robbery. She also claimed that the robbery was not Father's idea, but it "wasn't technically all [her] idea either." When asked whether she had told the Department that Father had convinced her to commit the robbery, she testified that she did not recall saying that. Contrary to her previous testimony, Mother also testified that she and Father had committed multiple armed robberies in the past. When asked how many armed robberies the couple had committed, Mother admitted that there were too many to recall.

## C.    Father

Father also testified at the hearing. Father denied receiving the family service plan that the Department claimed that it mailed to him at the Harris County jail in July 2017. According to Father, he did not receive a family service plan until his attorney provided him with one in October 2017. Father stated that the Department

never contacted him and he explained it was physically impossible for him to comply with any part of the service plan because he had been in the Harris County jail on a bench warrant since December 2017. Father testified that his oldest sister, Shatoria Williams, his mother Crystal, Sheree Sowell, and his grandmother were willing to take care of and support Charlie until he is released from prison. Father testified that without the support of his family, he has no other means of providing support for Charlie. Father stated that he believed that it was in Charlie's best interest that his parental rights not be terminated because he can provide his son with guidance that he had missed out on because he grew up without a father.

Father's sister, Lovella Johnson, testified that the Department never contacted her and that, if she had been contacted, she would have asked for Charlie to be placed with her. She also admitted that she learned that Charlie was in the Department's care from her sister, not Father, who had been served with the Department's suit in December 2016.

## Sufficiency of the Evidence

In four issues on appeal, Father argues that legally and factually insufficient evidence supports the trial court's findings that: (1) he committed the predicate acts under sections 161.001(b)(1)(E), (N), and (Q); and (2) termination of his parental rights is in Charlie's best interest.

8

## A.       Standard of Review and Applicable Law

A parent's right to the care, custody, and control of his child is a liberty interest protected under the Constitution, and we strictly scrutinize termination proceedings on appeal. *See Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see also Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Clear and convincing evidence must support an involuntary termination. *Holick*, 685 S.W.2d at 20 (citing *Santosky*, 455 U.S. at 747–48, 102 S. Ct. at 1391–92).

Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). Thus, we do not re-weigh issues of witness credibility but defer to the factfinder's reasonable determinations of such matters. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

In conducting a legal-sufficiency review in an appeal from a termination case, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that

the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *See id.* If, after conducting a legal sufficiency review of the record, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *See id.*

In conducting a factual-sufficiency review in a parental-rights-termination case, we determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm conviction or belief about the truth of the matter on which the Department bore the burden of proof. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *See In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* at 266.

The standard of review for legal and factual sufficiency challenges maintains a deferential standard for the factfinder's role, which means the trier of fact is the

exclusive judge of the credibility of the witnesses and, accordingly, the weight to be given their testimony. *See In re C.H.*, 89 S.W.3d at 25–26.

To prevail in a termination case, the Department must establish that one or more of the acts or omissions enumerated under Texas Family Code section 161.001(b)(1) occurred and that the termination is in the best interest of the children, pursuant to section 161.001(b)(2). *See* TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2016); *see also In re C.H.*, 89 S.W.3d at 23. "Only one predicate finding under section [161.001(b)(1)] is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## B. Sufficiency of the Evidence Supporting Termination of Father's Rights Pursuant to Section 161.001(b)(1)(E)

In his first issue, Father argues that legally and factually insufficient evidence supports the trial court's finding he committed the predicate act under section 161.001(b)(1)(E).

Subsection 161.001(b)(1)(E) provides that a parent's rights can be terminated when he has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet.

11

denied); *see also In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *Tex. Dep't Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) and *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)).

To satisfy subsection E, the parent's conduct must cause the endangerment, and the endangerment must be the result of a voluntary, deliberate, and conscious course of conduct by the parent rather than a single act or omission. *See In re K.P.*, 498 S.W.3d at 171; *Jordan*, 325 S.W.3d at 723. The endangering conduct, however, does need not be directed at the child, and it is not necessary that the child suffer any injury because of the conduct. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012) (citing *Boyd*, 727 S.W.2d at 533); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (holding that endangering conduct is not limited to actions directed toward child); *Jordan*, 325 S.W.3d at 723 (holding that danger to child may be established even if conduct is not directed at child and child suffers no actual injury).

Furthermore, the specific danger to the child's well-being may be inferred from parental misconduct standing alone and courts may consider parental conduct that did not occur in the child's presence, including conduct that occurred before the child's birth. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re E.N.C.*, 384 S.W.3d 796, 804–05 (Tex. 2012) (stating criminal offense occurring

12

before child is born can be relevant factor in establishing whether parent engaged in endangering course of conduct for purposes of subsection E).

Although incarceration alone will not support termination of someone's parental rights, evidence of a parent's criminal conduct, convictions, and imprisonment may support a finding of endangerment under section 161.001(b)(1)(E) because such conduct subjects a child to a life of uncertainty and instability. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating parent's conduct that subjects child to life of uncertainty and instability endangers child's physical and emotional well-being); *see also In re A.A.M.*, 464 S.W.3d 421, 426–27 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

It is undisputed that Mother and Father have been incarcerated for Charlie's entire life and unable to care for their child. It is also undisputed that Father, who was born in 1988, pleaded guilty to committing two armed robberies using a firearm and was sentenced to a total of fifteen years' incarceration. Specifically, Father committed the first armed robbery in March 2007 and was sentenced to seven years' incarceration; he was 18 years old at the time of the offense. Father committed the second armed robbery only four months after he was released from prison. He was sentenced to eight years' incarceration for the second armed robbery offense. Although Father denies having committed any other offenses, Mother testified that

13

she and Father had committed multiple armed robberies in the past and that she could not provide an exact number because there had been too many robberies to recall.

Although Father denied committing any crimes other than the two felonies he pleaded guilty to, and Mother initially testified that she had never seen Father engage in any criminal conduct except for the aggravated robbery they committed together, the trial court could have reasonably found Mother's subsequent testimony that the couple had committed too many armed robberies for her to recall an exact number to be more credible. *See In re J.F.C.*, 96 S.W.3d at 266.

Father argues that the evidence is insufficient to support the trial court's finding because "there is no nexus between his [criminal] behavior and the circumstances which brought the child into care. His convictions predate his son's birthdate." Father's argument is unavailing. To satisfy subsection E, the parent's conduct must cause the endangerment, not necessarily the circumstances which brought the child into care. *See In re K.P.*, 498 S.W.3d at 171; *Jordan*, 325 S.W.3d at 723. Such endangering conduct can include criminal offenses that occurred before the child was born. *See In re E.N.C.*, 384 S.W.3d at 804–05. Furthermore, there is evidence that Charlie came into the Department's care because he was born while Mother was incarcerated for the armed robbery she committed with Father, and, although disputed, there is also evidence that Father convinced Mother to participate in that armed robbery, thereby contributing to her incarceration.

14

After reviewing all the evidence in the light most favorable to the trial court's finding, including evidence of Father's pattern of committing violent felony offenses with a firearm and the fact that Father has been incarcerated for most of his adult life as a result of two such offenses, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Father engaged in a course of conduct endangering to Charlie under section 161.001(b)(1)(E). *See In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we hold that the evidence is legally sufficient to support the trial court's finding.

Viewing the evidence in a light favorable to the factfinder, including evidence both supporting and contradicting the finding, we conclude that the contrary evidence at trial is not so overwhelming as to undermine the trial court's firm conviction that Father engaged in a course of conduct endangering to Charlie under section 161.001(b)(1)(E). *See In re J.F.C.*, 96 S.W.3d at 266; *see also In re C.H.*, 89 S.W.3d at 25. Accordingly, we hold that the evidence is factually sufficient to support the trial court's finding.

We overrule Father's first issue.

Because we have determined that sufficient evidence supports the trial court's predicate findings under subsection (E), we do not need to consider whether there is sufficient evidence supporting the other predicate findings.

15

## C.     Best Interest

In his fourth issue, Father argues that legally and factually insufficient evidence supports the trial court's finding that termination of his parental rights is in Charlie's best interest. Specifically, Father contends that he is "at the mercy of his circumstances," i.e., his current incarceration, and has not had an opportunity to demonstrate his parenting skills or establish a relationship with Charlie. He further contends that, although Charlie's foster parents appear to be meeting his physical and emotional needs, their ability to do so in the future is speculative. He also argues that although the foster parents do not pose a current danger to Charlie's physical and emotional well-being, this may not be the case in the future, especially if their circumstances change.

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment, however, is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2018). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best-interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, however, and evidence is not required on all the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *see also In re D.R.A.*, 374 S.W.3d at 533.

The Texas Family Code also sets out similar factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether

17

the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. *See* TEX. FAM. CODE ANN. § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116.

Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence when conducting the best interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

Evidence supporting termination under one of the predicate grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest). A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d at 684. A fact finder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (citing *In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2004, pet. denied)).

### 1. Analysis

Charlie is currently placed in a safe, stable, and "very loving home" with a foster family that he has bonded with and that wants to adopt him. By all accounts, the family is meeting Charlie's current emotional, financial, and physical needs, and the Department believes they will be able to do so in the future. *See generally In re O.N.H.*, 401 S.W.3d at 684 (stating past conduct is probative of parent's future conduct when evaluating child's best interest). There is nothing in the record indicating otherwise. Charlie's foster parents also appear to have a stable marriage and good parenting skills, and the Department does not foresee any issue preventing the foster parents from adopting Charlie, if Mother's and Father's parental rights are terminated.

The record also demonstrates that Father, who has been incarcerated for Charlie's entire life, has never met his son or attempted to establish a relationship with Charlie. Furthermore, Father has not been able to meet Charlie's current physical and emotional needs, as evidenced by the fact that he neither reached out to any of Charlie's caseworkers during the pendency of this suit to inquire about the boy's well-being nor provided any support, letters, or gifts for Charlie while he has been in the Department's care. Father did not provide the Department with a list of possible family placements until ten months after he was served with the Department's petition. The Department considered some of Father's relatives and

19

found that at least two were not suitable placements for Charlie, and they were unable to perform home studies for others because another study was pending at the time. Notably, none of these relatives provided any support or gifts for Charlie while he was in the Department's care.

The evidence supporting the trial court's finding that Father engaged in a course of conduct endangering to Charlie under subsection E, including Father's pattern of committing violent felony offenses with a firearm and resulting incarcerations, also weighs in favor of termination of Father's parental rights. *See Edwards v. Tex. Dep't of Protective and Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997, no writ). Furthermore, the trial court could reasonably infer from this evidence that such endangering conduct will occur in the future. *See In re D.M.*, 452 S.W.3d at 471 (stating factfinder may infer that parent's past conduct endangering child's well-being may recur if child is returned to parent when assessing whether termination of parent's parental rights is in child's best interest).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Father's parental rights is in Charlie's best interest. *See In re J.O.A.*, 283 S.W.3d at 345. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Father's parental rights is in Charlie's

best interest. *See id.* Accordingly, we hold that legally and factually sufficient evidence supports the trial court's best interest finding.

We overrule Father's fourth issue.

## Conclusion

We affirm the trial court's final order terminating Father's parental rights to Charlie.


Russell Lloyd
Justice

Panel consists of Justices Keyes, Bland, and Lloyd.